**E-FILED on** 8/12/08

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re EXTREME NETWORKS, INC. SHAREHOLDER DERIVATIVE LITIGATION<br><br>———————————————<br>This Document Relates To:<br>    ALL ACTIONS. | No. C-07-02268 RMW<br><br>ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS<br><br>**[Re Docket No. 68]** |

    Lead plaintiff Frank Grucel brings the present action as a derivative suit on behalf of Extreme Networks, Inc. ("Extreme") against certain current and former directors and officers of Extreme. Nominal defendant Extreme moves to dismiss the second amended complaint ("SAC") for failure to make demand against the company or to plead with particularity that demand should be excused. Extreme also moves to dismiss on the grounds that lead plaintiff Grucel lacks standing. Plaintiffs oppose the motion. The court has read the moving and responding papers and considered the arguments of counsel presented at a hearing on August 8, 2008. For the reasons set forth below, the court GRANTS Extreme's motion to dismiss.

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—07-02268 RMW
RSM

## I. FACTS

Lead plaintiff Grucel filed his original complaint on May 31, 2007. The SAC was filed on February 25, 2008. Plaintiffs assert violations of federal securities and state laws against certain current and former directors and officers of Extreme arising from stock option backdating. SAC ¶¶ 1, 2. Specifically, plaintiffs allege that officers and directors of Extreme manipulated the grant dates and associated documentation of stock options used to compensate Extreme employees and directors. *Id.* ¶¶ 6, 9, 12, 14-17. Plaintiffs allege that the various illegal activities occurred between 1999 and 2006, which is the "relevant period" for this lawsuit. *Id.* ¶ 24. Because plaintiffs must demonstrate that making a demand on the board of directors would have been futile (a factually-intensive inquiry), the details of Extreme's corporate structure, history and transactions follow.

### A. Structure of the Board of Directors

Extreme is a Delaware corporation with its principal executive offices in Santa Clara, California. SAC ¶ 4. Extreme designs ethernet infrastructure solutions for enterprises and service providers. *Id.* Its common stock is listed on the Nasdaq under the stock symbol EXTR. *Id*.

The Extreme board has two committees relevant to this motion. The Compensation Committee "reviews the performance and compensation levels for executive officers and sets salary and bonus levels and option grants under [the] stock option plan." *Id.* ¶ 61; *see also id.* ¶ 62. The Audit Committee reviews and reports to the Board on:

> (I) the financial reports and other financial information provided by the Company to any governmental body or to the public, (ii) the Company's systems of internal and external controls regarding finance, accounting, legal compliance and ethics that management and the Board have established and (iii) the Company's auditing, accounting and financial reporting processes in general.

*Id.* ¶ 63.

At the time this suit was filed, Extreme's board of directors consisted of seven members, Mark Canepa and defendants Gordon L. Stitt, W. Michael West, Harry Silverglide, Robert L. Corey, Kenneth Levy and Charles P. Carinalli. *Id.* ¶¶ 29, 201. Stitt co-founded Extreme in 1996 and served as president, CEO and director until August 2006 when he was appointed Chairman of the Board. *Id.* ¶ 39. West served as Chairman of the Board from September 2004 until August 2006. *Id.* ¶ 40. He continued to serve as a director until 2007. *Id*. Silverglide has been a director of Extreme since

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—07-02268 RMW
RSM                                             2

June 2004 and served on the Audit Committee in 2006. *Id.* ¶¶ 30, 45. Corey joined the board in December of 2003, the Compensation Committee in July 2004 and the Audit Committee in 2005. *Id.* ¶ 46. Levy has served on the Extreme board since October 2001 and served on the Audit Committee in 2005 and the Compensation Committee in 2005 and 2006. *Id.* ¶¶ 30, 47. Carinalli has been a director of Extreme since October 1996, served on the Compensation Committee from 1999-2007 and served on the Audit Committee from 2001-2007. *Id.* ¶ 48.

The committee membership details are summarized in the following table[1]:

|      | **Compensation Committee** | **Audit Committee** |
| ---- | -------------------------- | ------------------- |
| **FY98** | Carinalli |  |
| **FY99** | Carinalli |  |
| **FY00** | Carinalli | Carinalli |
| **FY01** | Carinalli | Carinalli |
| **FY02** | Carinalli | Carinalli |
| **FY03** | Carinalli | Carinalli, Corey |
| **FY04** | Carinalli, Corey, Levy | Carinalli, Corey, Levy |
| **FY05** | Carinalli, Corey, Levy | Carinalli, Corey, Silverglide |

*See id.* ¶ 30. Gordon Stitt and Michael West, although both serving on the board of directors, never served on either the Compensation or Audit Committee.

According to Extreme's certificate of incorporation, Extreme directors are immunized to the fullest extent permitted by the Delaware General Corporation Law. Decl. of Joseph E. Floren, Ex. 12 (June 27, 2008) (reproducing Extreme's certificate of incorporation as part of the Form S-1 filed with the SEC).[2] Consequently, the directors cannot be held liable for any breach of fiduciary duty, except for breaches of the duty of loyalty, actions involving intentional misconduct or actions taken "not in good faith," and transactions from which they derive an improper personal benefit. *See* 8 Del. C. § 102(b)(7).

---

[1] Members not pertinent to the court's analysis have been omitted.

[2] Public records, such as SEC filings, are properly the subject of judicial notice, and routinely considered in deciding a motion to dismiss in a securities case. *See, e.g.*, *In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 953-54 (N.D. Cal. 2007); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 865 (N.D. Cal. 2004); *In re Calpine Sec. Litig.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal. 2003).

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—07-02268 RMW
RSM                                                     3

### B.     Extreme's Investigation Into Backdating, and Restatement

Concerns about stock option backdating began with the now-famous *Wall Street Journal* article of March 18, 2006 reporting academic research suggesting that various companies were suspiciously lucky in selecting their option grant dates. On September 15, 2006, Extreme announced in a Form 8-K that its directors appointed a special committee of outside companies to review Extreme's historical practices and accounting for stock option grants. SAC ¶ 183. This investigation delayed the filing of Extreme's Form 10-K for 2006 and jeopardized Extreme's listing on Nasdaq. *Id.* ¶¶ 183-189. On January 8, 2007, Extreme announced that it had reached a preliminary conclusion that the dates of some stock option grants differed from the actual grant dates. *Id.* ¶ 186. Accordingly, Extreme advised that its past financial statements for the fiscal periods 2000 through the third quarter of 2006 could not be relied upon and would need to be restated. *Id.*

Extreme released further details of its investigation in its delayed Form 10-K for 2006, filed on June 28, 2007. *Id.* ¶ 190. The special committee examined option grants from April 9, 1999 through September 30, 2006. *Id*. The review encompassed over 8,000 grants on 346 grant dates. *Id.* ¶¶ 190, 191. The grant date was incorrect for 72 of the 346 grant dates examined. *Id*. ¶ 191. While the deficiencies that led to incorrect reporting dates occurred predominantly between 1999 and 2001, they continued to some degree until 2005. *Id.* ¶ 190. The special committee found that the Board had delegated option granting authority to the CEO for grants of 40,000 shares or less to employees that were not officers or directors of the company. *Id.* ¶ 191.

Extreme issued options to officers, directors or other individuals requiring the Board's approval on 43 dates within the review period. *Id*. Of those 43 grant actions, 11 used the incorrect dates, 9 with lower stock prices than the actual dates. *Id.* Although the special committee found no evidence of fraud, in some cases the incorrect dates appear to have been the result of retrospective selection based on price considerations. *Id.* ¶¶ 190, 191 (citing Extreme's Form 10-K filed June 28, 2007). Of the affected option grants to Extreme's directors and officers, none were exercised and all but one grant have been surrendered or cancelled. Decl. of Joseph E. Floren, Ex. 2 at 54 (Extreme's

1  Form 10-K filed June 28, 2007).  In response to the special committee report, the board adopted new
2  processes to appropriately determine measurement dates.  *Id*.

### C. Instances of Alleged Backdating

Plaintiffs allege backdating at Extreme for 10 of the 12 publicly reported grants between September 1999 and December of 2001.  SAC ¶¶ 82-117.  While the facts as pleaded would appear to be sufficient to allege backdating of these grants, the complaint is rife with factual errors.  The complaint contains multiple incorrect stock prices.  *See id.* ¶¶ 91, 95, 99.  Additionally, the complaint makes factually incorrect allegations.  *See id.* ¶¶ 102, 105, 109.  For example, the grant on October 22, 2001 was alleged to be "***the lowest share price for that month***" (emphasis in original) when it is in fact not in the lowest third of prices for the month.  *Id*. ¶¶ 109.  While a minority of these errors appear to strengthen the allegations of backdating, these defects in the complaint raise serious questions as to whether the complaint is well pleaded.

Plaintiffs also challenge four option grants between October 2003 and January 2006.  *Id*. ¶¶ 120-21.  Three of these grants were reported in Form 4s that were filed outside of the two business day SEC requirement.  *Id*. ¶ 120.  The Form 4 for the grant on September 29, 2004 was filed one day late.  *Id*.  The price increase between the filing and the grant date was 9.46%.  *See id*.  The filing of the Form 4 for the January 25, 2006 grant was five days late, resulting in a stock increase of 4%.  *See id*.  Finally, the plaintiffs acknowledge that the June 3, 2004 grant was filed within the two day window required by the SEC, but note that it was issued on the lowest price of the month.  *Id*. ¶ 121.  The grants addressed in the complaint are summarized below:

|  | **Exercise Price** | **Alleged Indicia of Backdating** | **Defendant Recipients (directors emphasized)** |
|---|---|---|---|
| Sept. 17, 1999 | $57.38 | The stock price 20 days later was $87.25 resulting in a return of 52.07%.<br>The grant was not reported in a Form 4 until Jan. 10, 2000.<br>From the Merrill Lynch analysis: the management annualized return was 937%, compared to 88.39% for investors.<br>The grant preceded a "run-up" in the share price. | Hull: 100,000 options. |

| Date | Price | Details | Grants |
|---|---|---|---|
| Dec. 17, 1999 | $66.62 | The stock price 20 days later was $78 resulting in a return of 17.07%.<br>The grant was not reported in a Form 4 until Jan. 26, 2001.<br>From the Merrill Lynch analysis: the management annualized return was 307.5%, compared to 88.39% for investors.<br>The grant preceded a "run-up" in the share price. | Fukuda: 50,000 options.<br>Haddock: 170,000 options.<br>Palermo: 50,000 options.<br>Schneider: 170,000 options.<br>**Silverglide**: 140,000 options.<br>**Stitt**: 300,000 options. |
| Jan. 10, 2000 | $76.00 | This was the lowest share price for the month and fiscal quarter.<br>The stock price 20 days later was $93 resulting in a return of 22.37%.<br>The grant was not reported in a Form 4 until July 27, 2000.<br>From the Merrill Lynch analysis: the management annualized return was 402.6%, compared to 88.39% for investors.<br>The grant preceded a "run-up" in the share price. | Halabi: 100,000 options. |
| June 1, 2000 | $49.50 | This was the lowest share price for the month.<br>The stock price 20 days later was $101.12 (reported incorrectly in complaint).<br>The grant was not reported in a Form 4 until July 27, 2000.<br>The grant preceded a "run-up" in the share price.<br><br>(As the complaint reported the incorrect stock price, the Merrill Lynch and CFRA analyses cannot be relied upon.) | Halabi: 100,000 options. |
| June 8, 2000 | $75.00 | The stock price 20 days later was $112 (reported incorrectly in complaint).<br>The grant was not reported in a Form 4 until July 27, 2000.<br>The grant preceded a "run-up" in the share price.<br><br>(As the complaint reported the incorrect stock price, the Merrill Lynch and CFRA analyses cannot be relied upon.) | Miller: 120,000 options. |
| July 5, 2000 | $94.94 (reported incorrectly in complaint) | The stock price 20 days later was $134.38 (also reported incorrectly in complaint).<br>The grant was not reported in a Form 4 until June 8, 2001.<br>The grant preceded a "run-up" in the share price.<br><br>(As the complaint reported the incorrect stock price, the Merrill Lynch and CFRA analyses cannot be relied upon.) | **Stitt**: 400,000 options.<br>Haddock: 200,000 options.<br>Schneider: 200,000 options.<br>**Silverglide**: 200,000 options.<br>Hull: 50,000 options.<br>Palermo: 200,000 options. |

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—07-02268 RMW
RSM                                                               6

| | | | |
|---|---|---|---|
| April 9, 2001 | $14.57 | This was the lowest share price for the month and fiscal quarter. (It was not the lowest share price of the year as reported in the complaint. The entire month of October was lower.)<br>The stock price 20 days later was $34.65 resulting in a return of 137.82%.<br>The grant was not reported in a Form 4 until July 26, 2001.<br>From the Merrill Lynch analysis: the management annualized return was 2480.7%, compared to 70.83% for investors.<br>The grant preceded a "run-up" in the share price. | **Carinalli**: 50,000 options.<br>**Silverglide**: 100,000 options.<br>**Stitt**: 200,000 options.<br><br>Complaint also states that "top executive officers" received "$600,000 options." It is unclear if this is a scrivener's error or if the plaintiffs are measuring this grant in dollar amount as opposed to number of shares. |
| Oct. 2, 2001 | $6.42 | This was the lowest share price for the month and fiscal quarter. (It was also the lowest share price of the year not the second lowest as reported in the complaint.)<br>The grant was reported in a Form 4, 12 days later on Oct. 18, 2001.<br>The stock price 12 days later was $10.78.<br>The grant preceded a "run-up" in the share price.<br><br>(As the grant was reported 12 days later, the use of analyses that rely on 20 day returns is illogical. Consequently, the Merrill Lynch and CFRA are inapplicable.) | Todd: 850,000 options. |
| Oct. 22, 2001 | $10.64 | This share price was not in the lowest third of prices for the month. (The complaint erroneously alleges that this was the lowest share price of the month.)[3]<br>The grant was reported in a Form 3, 8 days later on Nov. 1, 2001. (The complaint erroneously alleges that it was reported 10 days later.)<br>The stock price 8 days later was $11.70.<br>The grant preceded a "run-up" in the share price.<br><br>(As the grant was reported 8 days later, the use of analyses that rely on 20 day returns is illogical. Consequently, the Merrill Lynch and CFRA are inapplicable.) | **Levy**: 100,000 options. |

---

[3] This error was noted and corrected in a letter to the court from plaintiff's counsel filed immediately after the hearing on August 8, 2008.

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—07-02268 RMW
RSM                                                7

| Date | Price | Notes | Grants |
|---|---|---|---|
| Dec. 28, 2001 | $12.76 | This was the second lowest share price for the month.<br>The grant was reported in a Form 4, 8 days later on Jan. 4, 2002.<br>The stock price 8 days later was $16.55.<br>The grant preceded a "run-up" in the share price.<br><br>(As the grant was reported 8 days later, the use of analyses that rely on 20 day returns is illogical. Consequently, the Merrill Lynch and CFRA are inapplicable.) | **Stitt**: 750,000 options.<br>Schneider: 385,000 options.<br>Haddock: 385,000 options.<br>**Carinalli**: 137,500 options. |
| Oct. 23, 2003 | $7.07 | This was the third lowest share price for the month.<br>The grant was reported in a Form 4, 12 days past the SEC deadline, on Nov. 12, 2003.<br>The stock price when reported was $9.69. | Unknown |
| June 3, 2004 | $4.97 | This was the lowest share price for the month.<br>The grant was reported in a Form 4 within the two day SEC deadline.<br>The stock price when reported was $5.19. | Unknown |
| Sept. 29, 2004 | $4.44 | This was the third lowest share price for the month.<br>The grant was reported in a Form 4, one day past the SEC deadline, on Oct. 4, 2004.<br>The stock price when reported was $4.86. | Unknown |
| Jan. 25, 2006 | $4.74 | The grant was reported in a Form 4, 5 days past the SEC deadline, on Feb. 3, 2006.<br>The stock price when reported was $4.93. | Unknown |

### D. Procedural History

Lead plaintiff Grucel filed his original complaint on May 31, 2007. On June 8, 2007 Grucel moved to have his case consolidated with two other actions against defendants, and to have himself appointed lead plaintiff. In this motion Grucel asserted that he should be appointed lead plaintiff because "he filed a particularly well-researched and comprehensive complaint" and "has thus demonstrated his intention to aggressively represent the interests of Extreme Networks in this case with energy, enthusiasm and vigor." Mot. to Consolidate Actions and to Appoint Frank A. Grucel, Jr. Lead Pl. and Appoint Lerach Coughlin Stoia Geller Rudman & Robbins LLP Lead Counsel at 8-9 (June 8, 2007).

Plaintiffs Yenna Wu and Linda Erikson did not make a timely opposition to this motion. On July 10, 2007, plaintiffs Wu and Erikson filed a Motion to Consolidate Related Actions and Appoint

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—07-02268 RMW
RSM                                   8

Lead Plaintiffs and Lead Counsel.  Subsequently, on July 31, 2007, Plaintiffs Wu and Erikson filed a Notice of Withdrawal of Yenna Wu and Linda Erikson's Motion to Consolidate Cases and to Appoint Lead Plaintiffs and Lead Counsel.  On August 13, 2007, Grucel was appointed lead plaintiff.

The first amended complaint was filed October 11, 2007.  Nominal defendant Extreme filed a motion to dismiss on November 26, 2007.  The parties agreed to a stipulation allowing Grucel to file a second amended complaint by February 25, 2008, and the first motion to dismiss was vacated.  The SAC was filed on February 25, 2008.  In the SAC, Grucel informs the court that he is no longer able to "aggressively represent the interests of Extreme Networks in this case with energy, enthusiasm and vigor," as he has disposed of his shares in Extreme.  *See* SAC ¶ 36 n.7.  In this same footnote, the plaintiffs appear to be moving for permissive intervention under Fed. R. Civ. P. 24 of Kathleen Wheatley, and moving to then substitute this new party as lead plaintiff.  *Id*. ("plaintiffs seek to substitute Kathleen Wheatley" who "is willing to intervene as plaintiff").

The SAC also makes reference to George Bennett, Jr.  SAC ¶ 37.  On February 20, 2008, lead counsel filed a complaint on behalf of Bennett, Case No. 08-cv-01033-RMW.  Five days later, on February 25, lead counsel filed the SAC in the instant action naming Bennett as a party.  SAC ¶ 37.  Lead counsel purported to notify the court that Bennett's case should be consolidated with the instant action by including a footnote in the SAC.  *Id*. ¶ 37 n.8.  Lead counsel does not represent plaintiffs Wu or Erikson.  Plaintiffs Wu and Erikson are not mentioned in the SAC.[4]

## II. ANALYSIS

Plaintiffs did not make a demand on the Extreme board before filing this suit.  SAC ¶ 29. Nominal defendant Extreme moves to dismiss because plaintiffs have not adequately alleged that demand on the board would have been futile.  Further, Grucel has disposed of his shares of stock in Extreme.  *Id*. ¶ 36 n.7.  Extreme thus also moves to dismiss because Grucel no longer has standing to maintain this action.

---

[4] It appears that lead counsel, by filing an action on behalf of Bennett, are attempting to use the consolidation procedure to add a plaintiff who is represented by them.  As set forth below, the court will require plaintiffs to move to appoint a new lead plaintiff and lead counsel.

### A. Grucel's Standing

The Federal Rules of Civil Procedure require a shareholder bringing a derivative suit to have been a shareholder at the time of the challenged transaction and that the shareholder "fairly and adequately represent the interests of shareholders." Fed. R. Civ. P. 23.1. As discussed above, Grucel has sold his shares of stock in Extreme. The sale of his stock renders Grucel without standing to maintain this action. *Johnson v. Untied States*, 317 F.3d 1331, 1333-34 (Fed. Cir. 2003) ("when a plaintiff bringing an action on behalf of the corporation is the legal owner of the stock at the time of filing but does not maintain shareholder status throughout the course of litigation, the plaintiff no longer has standing to bring the action"). Although Grucel can no longer proceed with this action, another qualified shareholder can intervene on the grounds that their rights are no longer represented. *Malcolm v. Cities Serv. Co.*, 2 F.R.D. 405, 407 (D. Del. 1942). "The cause of action, if there be one, remains unaffected by the sale of the plaintiff's stock." *Id.*; *see also Pikor v. Cinerama Prod. Corp.*, 25 F.R.D. 92, 94-95 (S.D.N.Y. 1960). Grucel's lack of standing is fatal to the operative complaint, however, the presence of other plaintiffs as well as other shareholders seeking to intervene dictates that the dismissal be without prejudice. *See Pikor*, 25 F.R.D. at 95. The court expects that Grucel will withdraw from this action.

As discussed above, the second amended complaint indicates that Kathleen Wheatley seeks to intervene as lead plaintiff. SAC ¶ 36 n.7. Any party seeking permissive intervention must actually file a motion with the court and not simply insert their name into the complaint. *See* Fed. R. Civ. P. 24(b). A footnote in the complaint is not a substitute for following the rules of civil procedure. If Kathleen Wheatley seeks to intervene in this matter she may file a motion before the court. With Grucel's failure to adequately represent the shareholders and the potential addition of intervening plaintiffs, the court needs to carefully consider who would best represent the interests of Extreme. Accordingly, the parties should file new motions to appoint lead plaintiff and lead counsel, detailing why a chosen individual would be the best representative for the affected shareholders.

### B. Failure to Verify Complaint

Rule 23.1(b) requires the complaint in a derivative action to be verified. The verification

requirement exists to prevent baseless strike suits. *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966). Combined, Rule 11 and Rule 23.1 serve to assure the court "that some person, party, attorney, advisor, or otherwise has responsibly investigated the allegations at the behest of the named plaintiff, who then stands behind the merits of the complaint." *Rogosin v. Steadman*, 65 F.R.D. 365, 367 (S.D.N.Y. 1974). An unverified derivative complaint should be dismissed with leave to amend. *See, e.g.*, *Glenbrook Capital Ltd. Partnership v. Kuo*, 525 F. Supp. 2d 1130, 1146 (N.D. Cal. 2007); Wright, Miller & Kane, Federal Practice and Procedure § 1827, at 57-58 (2d ed. 1995); *but see McDonough v. Americom Int'l Corp.*, 151 F.R.D. 140, 143 (M.D. Fla. 1993) (declining to dismiss but requiring plaintiff to submit a verification within thirty days).

Rule 23.1(b)'s verification requirement has rarely been the subject of litigation, leaving many questions about its limits and what requirement it imposes above and beyond Rule 11's required reasonable investigation. *See generally* Wright, Miller & Kane, Federal Practice and Procedure § 1827 (2d ed. 1995). Rule 23.1's requirement appears similar to that imposed on private securities plaintiffs under the Private Securities Litigation Reform Act. *Compare* Fed. R. Civ. P. 23.1 *with* 15 U.S.C. § 77z-1(a)(2). The certification requirement for private securities class actions was imposed because Congress believed "that the plaintiff's bar had seized control of class action suits, bringing frivolous suits on behalf of only nominally interested plaintiffs in the hope of obtaining a quick settlement." *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 58 (D. Mass. 1996). Congress hoped that requiring the investor to certify the complaint would "transfer[] control of the litigation from the attorneys to the investors." *In re USEC Securities Litigation*, 168 F. Supp. 2d 560, 564 (D. Md. 2001).

Here, the second amended complaint has not been verified by anyone who is presently a party to this action, however, a "verification" was signed and submitted by Kathleen Wheatley, who, as discussed above, is not a party to the suit at this time. *See* SAC. The court has been unable to find any authority suggesting that a complaint can be verified by an individual who is not a party to the action. While Ms. Wheatley may at some point move to intervene in this action, she is not properly a plaintiff, much less the lead plaintiff, and cannot verify the complaint in this matter. The failure to verify is significant given the lead plaintiff's lack of standing and the apparent factual

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—07-02268 RMW
RSM                                                                 11

errors in the complaint. In light of these intervening events, it is appropriate to insist on verification by a proper party to the case to confirm that the plaintiff investors still wish to pursue this case.

### C.     Demand Futility

Delaware law requires a derivative plaintiff to first make a demand on the board of directors to address the shareholder's concerns. *Ryan v. Gifford*, 918 A.2d 341, 351-52 (Del. Ch. Ct. 2007). If the shareholder chooses not to make a demand, the shareholder must plead with particularity why such a demand is excused. Fed. R. Civ. P. 23.1(b)(3)(B); *see, e.g., CNET Networks*, 483 F. Supp. 2d 947.

#### 1.     Standards Governing Demand Futility

Delaware law has two standards for excusing demand. *Compare Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) *with Rales v. Blasband*, 634 A.2d 927, 933-34 (Del. 1993). "Where the challenged transaction was not a decision of the board upon which plaintiff must seek demand," the *Rales* test applies. *See, e.g., Ryan*, 918 A.2d at 353. The *Rales* test requires the plaintiff to allege particular facts that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 353 (quoting *Rales*, 634 A.2d at 933-34).

Plaintiffs have made allegations challenging options granted between 1999 and 2006. While the plaintiffs are entitled to inferences in their favor, those inferences must be reasonable ones. Despite numerous deficiencies in the complaint, plaintiffs have alleged sufficient facts to raise a reasonable inference that some backdating occurred between 1999 and 2003. Plaintiffs have not alleged with specificity facts sufficient to raise a reasonable inference of backdating after 2003. The board in place at the time Grucel filed suit was not the same as the board in place between 1999 and 2003. Accordingly, the court applies the *Rales* standard to decide whether demand is excused. *Accord Desimone v. Barrows*, 924 A.2d 908, 927-28 (Del. Ch. Ct. 2007) (applying *Rales* where all parties agreed it applied).

#### 2.     Whether the Extreme Board is Disinterested and Independent

To successfully plead demand futility, plaintiffs must demonstrate that there is a reasonable doubt that a majority of the board of directors are not disinterested and independent. *Beam ex rel.*

*Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004). A director is presumed to be faithful to the corporation and able to objectively consider a demand. *Id.* at 1048. The plaintiffs must show, with particularity, why that presumption is overcome with respect to a majority of the board. *Id.* at 1048-49. Accordingly, plaintiffs must demonstrate that there is a reasonable doubt that at least four of the seven Extreme directors were not disinterested and independent. In determining whether plaintiffs have pled demand excuse, the court notes that an inquiry into a board's ability to consider a demand is context-dependent and fact-specific. *Id.* at 1049-50; *see also Desimone*, 924 A.2d at 931 (suggesting a "cautious" and "non-generic" approach to considering challenges to options practices).

Accordingly, to plead demand futility plaintiffs must specifically allege facts that create a reasonable doubt that a majority of directors are disinterested and independent. A substantial risk of personal liability can create a reasonable doubt about a director's disinterestedness. *Wood v. Baum*, __ A.2d __, 2008 WL 2600981 at *2 (Del. 2008). However, when directors are exculpated from liability for certain conduct, the plaintiff must plead particularized facts alleging a non-exculpated claim against the directors. *Id.* at *3. If directors are exculpated except for claims based on "'fraudulent,' 'illegal' or 'bad faith' conduct," then "a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.*, that they had 'actual or constructive knowledge' that their conduct was legally improper." *Id.*

In *Wood*, the Delaware Supreme Court upheld the dismissal of a complaint by the Court of Chancery for failure to excuse demand. *Id.* at *4. Municipal Mortgage and Equity is a LLC with a ten-member board of directors. *Id.* at *1. The operating agreement exempts directors from any liability "except in the case of fraudulent or illegal conduct of such person." *Id.* The complaint alleged "many violations of federal securities and tax laws but [did] not plead with particularity the specific conduct in which each defendant 'knowingly' engaged." *Id.* at *3. When asked to identify particularized facts that would establish actual or constructive knowledge, the plaintiff identified facts falling into "four main categories: (a) the defendants executed MME's annual reports and other publicly filed financial reports; (b) the defendants authorized certain transactions; (c) five of the defendants served on MME's Audit Committee; and (d) other 'red flags'." *Id.* None of the alleged

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—07-02268 RMW
RSM                                              13

facts were sufficient to demonstrate actual or constructive knowledge. *Id*. Specifically, neither the execution of financial reports by directors nor membership on a committee is sufficient to establish scienter. *Id*. at *3-*4.

Paragraph 201 comprises plaintiffs' allegations regarding demand futility. At the time suit was filed, Extreme's board of directors consisted of Mark Canepa, Gordon L. Stitt, W. Michael West, Harry Silverglide, Robert L. Corey, Kenneth Levy and Charles P. Carinalli. SAC ¶ 201. Plaintiffs make no allegations against director Canepa. *See id.* The complaint has boilerplate allegations against all of the directors except Canepa consisting of knowledge of backdating based on committee service, issuance of false financial statements and administration of stock option grants. *Id*. The complaint alleges that Stitt, Carinalli, Silverglide and Levy are interested through the receipt of backdated stock option grants. *Id*. Additionally, the complaint alleges that Stitt, Carinalli and Silverglide participated in insider trading. *Id*.

### a.   Backdated Stock Option Grants

Plaintiffs do not contend that three of the directors, West, Corey and Canepa, are interested by virtue of receiving backdated options. Plaintiffs allege, however, that Stitt, Carinalli, Silverglide and Levy are interested because they received backdated stock option grants. SAC ¶ 201. These alleged backdated options were granted on five separate occasions. *Id*. ¶ 116. However, there are factual errors in the complaint for three of these five occasions. *See* option chart *supra* (July 5, 2000; April 9, 2001; Oct. 22, 2001).

Moreover, the one and only questioned grant to Levy does not appear to suggest backdating. The grant to Levy on October 22, 2001 was not even in the lower third of prices for that month. The challenged grant was reported to the SEC within eight business days on a Form 3. SAC ¶ 109. A Form 3 filing is an initial statement of ownership of a beneficial security. *See* 17 C.F.R. §240.16a-3(a). The Form 3 was timely filed; the deadline for reporting an initial director grant is ten days. 15 U.S.C. 78p(a)(2)(B). Levy joined the board in October 2001, SAC ¶ 47, and so the fact that the option grant was reported on a Form 3 that same month suggests that the grant coincided with Levy becoming a director. These facts alone do not raise a reasonable inference that this grant was backdated. *See In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 960 (N.D. Cal. 2007) ("Mere

reliance on the numbers is not sufficient when plaintiffs are confronted with a legitimate, judicially-noticeable explanation for the grant date. To plead with particularity that this grant was backdated, plaintiffs would need to allege specific facts showing that this was not the true grant date."); *accord In re Zoran Corp.*, 511 F. Supp. 2d 986, 1007 (N.D. Cal. 2007) ("The bottom line is that this grant seems to have been nothing more than the formulaic grant made to all directors upon joining the board. Backdating is not indicated.").

Additionally, none of these options were ever exercised by any of the directors and, at most, only one grant remains outstanding because the others were cancelled or surrendered. Decl. of Joseph E. Floren, Ex. 2 at 54 (Extreme's Form 10-K filed June 28, 2007). Plaintiffs have not pleaded any facts that would suggest that the directors received a benefit in exchange for the cancellation or surrender of their options.

The Delaware Chancery Court has held that accepting backdated stock options creates a reason to doubt a director's disinterestedness sufficient to disqualify him or her from being able to consider a demand. *Ryan*, 918 A.2d at 356. This court has suggested, however, that a director who no longer stands to benefit from backdated options may no longer be disqualified from considering a demand. *See CNET*, 483 F. Supp. 2d at 962. Here, the directors appear to have lost any apparently backdated stock options prior to the special committee report. Whether they were divested of any challenged options before suit was filed is unclear from the pleadings. It is therefore a close call as to directors Stitt, Carinalli, and Silverglide. It would be inappropriate, however, to disqualify Levy from considering a demand on the board regarding backdating as the plaintiffs have not pleaded facts sufficient to raise a reasonable inference that he is interested. Accordingly, even if directors Stitt, Carinalli and Silverglide all held backdated options when suit was filed, the plaintiffs have failed to establish that a majority of directors are interested due to holding backdated options.

    **b. Committee Membership, Filing of Statements and Administering Stock Option Grants**

The complaint alleges that all of the directors with the exception of Canepa should be disqualified from considering a demand on the board because they served on either the Compensation or Audit Committees, they filed false financial statements or were responsible for

ORDER GRANTING NOMINAL DEFENDANT'S MOTION TO DISMISS—07-02268 RMW
RSM              15

administering stock option grants. SAC ¶ 201. While plaintiffs do not address these allegations in their brief, they are made in the complaint to excuse demand failure.

"Delaware law on this point is clear: board approval of a transaction, even one that later proves to be improper, without more, is an insufficient basis to infer culpable knowledge or bad faith on the part of individual directors." *Wood*, 2008 WL 2600981 at *3. The Delaware Supreme Court has also made clear that a director's execution of financial reports, without more, is insufficient to create an inference that he had actual or constructive notice of any illegality. *Id*. at *3. The complaint's boilerplate allegations without particularized facts as to knowledge or intent on the part of any directors cannot overcome this. Demand excuse requires particularized facts.

Plaintiffs have not alleged any facts establishing culpable knowledge or bad faith, and therefore cannot raise a reasonable doubt as to disinterestedness. Consequently, they cannot show that a majority of the directors are not disinterested or independent and so the complaint must be dismissed.

### c.   Insider Trading

Plaintiffs allege that directors Stitt, Silverglide and Levy participated in insider trading by selling thousands of shares of stock based on knowledge of material non-public information. SAC ¶¶ 19, 39, 45, 48, 201, 204, 267-71. The complaint specifies the proceeds received from the sales and a range of dates in which the sales took place. *Id*. ¶ 19. It does not set forth any other details.

"[I]t is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information." *Guttman v. Huang,* 823 A.2d 492, 502 (Del. Ch. Ct. 2003). In *Guttman*, Vice Chancellor Strine examined the details surrounding stock sales by directors of NVIDIA and concluded that the plaintiffs had not pleaded sufficient facts to excuse a demand on the board. *Id*. at 503-4. Specifically, Vice Chancellor Strine looked not at the dollar proceeds but the pattern of trading, whether the directors' trading habits had changed year over year and whether the directors had divested themselves of large percentages of their total ownership. *Id*; *accord In re Silicon Graphics Inc.,* 183 F.3d 970, 986 (9th Cir. 1999) (whether insider trading is

suspicious depends upon: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history").

Plaintiffs have provided no particularized facts from which a reasonable inference of wrongdoing can be drawn. The complaint details only date ranges spanning as much as six years and dollar amounts of realized proceeds. It does not detail the percentage of the holdings sold by Carinalli, Silverglide and Stitt. It does not detail their past trading history, the timing of the sales or whether the pattern of trading is suspicious. It is a mere cursory allegation. Therefore, it would be inappropriate to disqualify any directors from considering a demand based on these allegations.

### D. Leave to Amend

Plaintiffs have not pleaded facts sufficient to show that a majority of the board in place when the action was commenced are not disinterested or independent and so have not excused the failure to make a demand. Based on the allegations and judicially noticeable SEC filings, none of the directors appear to have received an improper benefit from an allegedly backdated option grant. Plaintiffs have failed to allege with particularity any facts from which it could be inferred that particular directors knew or should have known of accounting improprieties and any facts suggesting that the board knowingly allowed or participated in a violation of law. Finally, the plaintiffs have failed to allege any facts suggesting that the sale of stock by directors was improper. In any event, even when backdating is "almost certain," the complaint must be dismissed unless it provides adequate detail regarding the knowledge and roles of the defendants. *In re Atmel Corp.*, 2007 WL 2070299 at \*6 (N.D. Cal. 2007)**.**

Grucel also lacks standing to continue this action. However, Grucel's inability to plead facts sufficient to excuse demand should not prejudice the shareholders he is no longer qualified to represent. Consequently, the court grants leave to plaintiffs to move to appoint a new lead plaintiff and counsel and to file an amended complaint.

### III.  ORDER

For the foregoing reasons, the court GRANTS Extreme's motion to dismiss.  Plaintiffs have twenty days to move to appoint lead plaintiff and lead counsel and file an amended complaint.

DATED:     8/11/08

*Ronald M Whyte*

RONALD M. WHYTE
United States District Judge

**United States District Court**
For the Northern District of California

1 **Notice of this document has been electronically sent to:**

2 **Counsel for Plaintiffs:**

3 Robert Bramson          rbramson@bramsonplutzik.com
  Emanuel Shachmurove     mshachmurove@sbtklaw.com
4 Aelish Marie Baig       AelishB@csgrr.com
  Lawrence Timothy Fisher ltfisher@bramsonplutzik.com
5 Alan R Plutzik          aplutzik@bramsonplutzik.com
  Frank James Johnson     frankj@johnsonbottini.com
6 Shawn A. Williams       shawnw@csgrr.com
  Eric L. Zagar           ezagar@sbtklaw.com

7

**Counsel for Defendants:**

8

John Henry Hemann        jhemann@morganlewis.com
9 Jonathan DeGooyer       jdegooyer@morganlewis.com
  Joseph Edward Floren    jfloren@morganlewis.com
10 Laura Alexis Lee        llee@morganlewis.com

11 Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

12

13

**Dated:**      8/12/08                         /s/ MAG
14                                        **Chambers of Judge Whyte**

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RSM                                    19