**E-FILED on** __11/17/09__

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re EXTREME NETWORKS, INC. SHAREHOLDER DERIVATIVE LITIGATION | No. C-07-02268 RMW<br><br>ORDER DENYING NOMINAL DEFENDANT'S MOTION TO STRIKE AND MOTION TO DISMISS |
| This Document Relates To:<br><br>    ALL ACTIONS. | **[Re Docket No. 101]** |

Lead plaintiff Kathleen Wheatley brings the present action as a derivative suit on behalf of Extreme Networks, Inc. ("Extreme") against certain current and former directors and officers of Extreme. Nominal defendant Extreme moves to strike allegations in the third amended complaint ("TAC") concerning transactions that predate lead plaintiff's ownership of Extreme stock. Extreme also moves to dismiss the TAC in its entirety for failure to make demand against the company or to plead with particularity that demand should be excused. Plaintiffs oppose the motions. The court heard argument on the motions on December 19, 2008. The court has read the moving and responding papers and considered the arguments of counsel. For the reasons set forth below, the court DENIES Extreme's motion to strike and motion to dismiss.

# I. FACTS

This case consolidates a number of lawsuits asserting violations of federal securities and state laws against certain current and former directors and officers of Extreme based on alleged conduct in the granting of stock options. Specifically, plaintiffs allege that the defendants engaged in a scheme to manipulate the grant dates and associated documentation of stock options issued by Extreme. TAC ¶¶ 5, 10. Plaintiffs also allege that defendants made false and misleading representations regarding Extreme's stock option granting and accounting practices in financial reports, proxy statements, press releases, and SEC filings. *Id.* ¶ 13. Plaintiffs challenge conduct that occurred between 1999 and 2005 (the "relevant period"). *Id.* ¶ 2.

## A. Structure of the Board of Directors

During the relevant period, Extreme's Board of Directors included a Compensation Committee, an Audit Committee, and a Nominating Committee. *Id.* ¶ 64. The Compensation Committee was responsible for administering Extreme's stock option plans and for making decisions concerning compensation for officers and directors, including option grants. *Id.* ¶¶ 65-66. The Audit Committee was responsible for financial oversight of the company. *Id.* ¶ 67.

At the time plaintiffs filed the TAC, Extreme's Board of Directors consisted of defendants Gordon L. Stitt, Charles P. Carinalli, Kenneth Levy, Robert L. Corey, and Harry Silverglide, and non-defendants Mark Canepa and John C. Shoemaker (the "Demand Board"). *Id.* ¶ 31. Three of these directors, Carinalli, Corey, and Levy, are alleged to have engaged in wrongdoing during their service on the Compensation and Audit Committees. *Id.* ¶¶ 32-33. The Demand Board's membership in the two committees may be summarized as follows:

|       | **Compensation Committee** | **Audit Committee** |
|-------|---------------------------|---------------------|
| FY98  | Carinalli                 |                     |
| FY99  | Carinalli                 |                     |
| FY00  | Carinalli                 | Carinalli           |
| FY01  | Carinalli                 | Carinalli           |
| FY02  | Carinalli                 | Carinalli           |
| FY03  | Carinalli                 | Carinalli, Corey    |

| FY04 | Carinalli, Corey, Levy | Carinalli, Corey, Levy |
| FY05 | Carinalli, Corey, Levy | Carinalli, Corey, Silverglide |

*Id.* ¶ 34.

### B.     Extreme's Internal Investigation

On September 15, 2006, Extreme announced in a Form 8-K that the Board had appointed a Special Committee to review the Company's historical practices granting and accounting for stock options. *Id.* ¶ 188. Extreme also announced that it had received and responded to an informal inquiry letter from the SEC regarding the same. *Id.* On January 8, 2007, Extreme announced that it had "reached a preliminary conclusion that the appropriate measurement dates for financial accounting purposes of certain stock option grants differ from the recorded grant dates of those awards." *Id.* ¶ 191. As a result, Extreme expected to restate some of its historical financial statements to record additional stock-based compensation expense and indicated that its financial statements from fiscal 2000 through the third quarter of 2006 should not be relied upon. *Id.*

> On June 28, 2007 in a Form 8-K, Extreme disclosed that
>
> The Special Committee found deficiencies in the Company's processes for approving and documenting option grants, which resulted in the Company erroneously treating the stated grant date as the measurement date for financial accounting purposes with respect to certain options. These deficiencies occurred predominantly during 1999 through 2001 (fiscal 2000 through 2002), but continued in some respects until fiscal 2004.

*Id.* ¶ 195. The Special Committee's findings were set out more fully in Extreme's Form 10-K, filed on the same day. *Id.* ¶ 196 & Ex. 2. The Special Committee found that Extreme would have to recognize an additional $223 million in non-cash share-based compensation charges as a result of certain grants, including

> grants that were not approved until after the stated grant date; grants that were dated and priced at a time when lists of grant recipients and share allocations were not yet complete; grants that were not accurately and timely documented; *grant dates that appeared to have been selected retrospectively, in some cases apparently due to price considerations*; grants that pre-dated the effective date of employment of the grantee; and grants that were completed and subsequently modified.

*Id.*, Ex. 2 at 53 (emphasis added).[1]

---

[1] Citations to Extreme's Form 10-K refer to the page numbers that appear in the original document filed with the SEC.

ORDER DENYING NOMINAL DEFENDANT'S MOTION TO STRIKE AND MOTION TO DISMISS—07-02268 RMW LJP
3

During the relevant period, the Board of Directors had delegated authority to then-Chief Executive Officer ("CEO") Stitt to approve grants of 40,000 shares or less to employees who were not officers or directors. *Id.* at 56. The Special Committee found that, during a period when the company had a policy of making weekly grants to newly hired employees, the policy had not been followed. *Id.* Instead, the grants had been entered into the stock plan management system in batches, with grants for multiple weeks entered on the same day. *Id.* "[A]nalysis showed the grant dates generally reflected the lowest achievable price for the batch periods, which ranged from 1 to 60 days, and averaged 30 days." *Id.*

The Special Committee reviewed 43 grants that were made to officers, directors, and to other individuals in amounts that required Board approval. *Id.* at 57. The Special Committee found that 11 of these grants had incorrect measurement dates. *Id.* Of those, 7 grants lacked sufficient contemporaneous documentation to support the recorded grant date, 2 grants had been completed and subsequently modified, and 2 grants predated the grantee's start date with Extreme. *Id.* The Form 10-K noted that

> None of the affected options granted to the Company's officers or directors during the Review Period has ever been exercised. Only one such grant, to an outside Director, remains outstanding; all other affected grants to officers or Directors were surrendered or cancelled in accordance with their terms in the ordinary course of business, prior to the Special Committee review.

*Id.* at 54. The Special Committee also found no evidence of fraud and concluded that none of the individuals involved intended to mislead investors. *Id.* at 53.

**C.     Allegedly Backdated Officer and Director Grants**

Between 1999 and August 2002, Extreme made twelve grants to officers and directors. *Id.* ¶ 83. Plaintiffs allege that ten of these grants occurred on or near a monthly stock price low or in advance of sharp stock price increases. *Id.* Plaintiffs also apply methodologies alleged to be used by the *Wall Street Journal*, Merrill Lynch, and the Center for Financial Research and Analysis ("CFRA") to analyze these grants. *Id.* ¶ 85. Taken together, plaintiffs argue that these facts support an inference of a pattern of backdating at Extreme. *Id.* ¶¶ 84-85.

The ten challenged grants occurred on September 17, 1999, December 17, 1999, January 10, 2000, June 1, 2000, June 8, 2000, July 5, 2000, April 9, 2001, October 2, 2001, October 22, 2001,

ORDER DENYING NOMINAL DEFENDANT'S MOTION TO STRIKE AND MOTION TO DISMISS—07-02268 RMW LJP
4

1  and December 28, 2001. *Id.* ¶¶ 86-120. For each of the challenged grants, the TAC sets forth the
2  recipients; the date on which the Form 4 reporting the grant was filed; the stock price on the grant
3  date; the stock price 20 days later and the percentage gain this represents over the grant price; a
4  "Merrill Lynch analysis" comparing the annualized 20-day cumulative return with the annualized
5  return for investors; and a graph showing the stock price movement for an approximately two month
6  period centered on the grant date. *Id.* For some grants, the TAC also alleges a "CFRA analysis"
7  comparing the grant price to the 10- and 40-day period stock price low and comparing the stock
8  price range to the lowest stock price. *Id.*[2]

Some of the challenged grants were made at relative lows in stock price. These allegations may be summarized as follows:

| Grant Date | Relative Stock Price |
|---|---|
| January 10, 2000 | lowest of month and fiscal quarter |
| June 1, 2000 | lowest of month |
| April 9, 2001 | third lowest of month, fiscal quarter, and fiscal year |
| October 2, 2001 | lowest of month and fiscal quarter<br>second lowest of year |
| December 28, 2001 | second lowest of month |

*Id.* ¶¶ 92, 95, 106, 109, 117.

Five of the challenged grants were made to recipients that include members of the Demand Board: the December 17, 1999 and July 5, 2000 grants to Silverglide and Stitt; the April 9, 2001 grant to Carinalli, Silverglide, and Stitt; the October 22, 2001 grant to Levy; and the December 28, 2001 grant to Carinalli. *Id.* ¶ 120.

Plaintiffs also challenge four out of twelve grants made after August 2002. *Id.* ¶¶ 122-24. For three grants, dated October 23, 2003, September 29, 2004, and January 25, 2006, defendants failed to file a Form 4 within 2 days as required by Sarbanes-Oxley. *Id.* Two of these grants fell on the third lowest price of the month and for all three grants the stock price increased between the

---

[2] Some of the allegations are internally inconsistent. For example, plaintiffs allege that the stock price 20 days after the July 5, 2000 grant was $128.31, but the stock price graph shows that the price never exceeded around $80 during that period. *Id.* ¶¶ 103, 105. Plaintiffs also report two different values for this grant's 20-day cumulative return, 35.15% and 41.5%. *Id.* ¶¶ 103-04.

ORDER DENYING NOMINAL DEFENDANT'S MOTION TO STRIKE AND MOTION TO DISMISS—07-02268 RMW LJP
5

grant date and the day on which the Forms 4 were filed. *Id.* A fourth grant, on June 3, 2004, fell on the lowest price of the month. *Id.* ¶ 124. The stock price increased from $4.97 to $5.19 between the grant date and the date the Form 4 was (timely) filed. *Id.* Plaintiffs do not identify the recipients of these four grants.

### D.  Levy's Conduct at Other Companies

The TAC includes allegations of Levy's conduct at other companies, which plaintiffs argue is relevant to the demand futility analysis. *Id.* ¶ 207(e)(iv). Specifically, Levy stands accused of options backdating at two other companies, KLA-Tencor Corp. ("KLA-Tencor") and Juniper Networks, Inc. ("Juniper"). *Id.* At both companies, shareholders have filed derivative actions and shareholder class actions which name Levy as a defendant. *Id.*

Levy is the founder of KLA-Tencor. *Id.* He served as CEO of the company from 1975 until mid-1997 and between mid-1998 and mid-1999. *Id.*, Ex. 3 at 25. He also served on the Board of Directors from 1975 until 2006 and on the stock option committee from 1994 until use of the committee was suspended in 2006. *Id.* KLA-Tencor conducted an internal investigation of its stock option practices in response to the May 22, 2006 *Wall Street Journal* article about options backdating, which specifically questioned the practices at KLA-Tencor. *Id.* at 23. The findings were reported in its Form 10-K filed January 29, 2007. *Id.*, Ex. 3. KLA-Tencor's Special Committee concluded that

> (1) there was retroactive pricing of stock options granted to all employees who received options, primarily during the periods from July 1, 1997 to June 30, 2002 . . . , (3) *the retroactive pricing of options was intentional*, not inadvertent or through administrative error, (4) *the retroactive pricing of options involved the selection of fortuitously low exercise prices by certain former executive officers, and other former executives may have been aware of this conduct*, (5) the retroactive pricing of options involved the falsification of Company records, resulting in erroneous statements being made in financial and other reports previously filed with the SEC, as well as in information previously provided to our independent registered public accounting firm, and (6) in most instances, the retroactive pricing of options violated the terms of our stock option plans.

*Id.* at 24 (emphasis added). The Form 10-K went on to state:

> Because virtually all holders of retroactively priced options issued by the Company were not involved in or aware of the retroactive pricing, the Board of Directors decided that we should continue to honor the options that violated the terms of our stock option plans, except in certain individual cases as described below.

...

*Id.* at 24. Levy's was one of several individual cases described. *Id.* at 25. The Form 10-K indicated that Levy had retired as a director and employee on October 16, 2006 and had entered into a Separation Agreement and General Release with the company under which his outstanding retroactively priced options had been re-priced to reflect the actual grant dates. *Id.*

Levy served on Juniper's Board of Directors from 2003 to May 2007 and was a member of Juniper's Compensation Committee from 2003 to 2006. *Id.* ¶ 207(e)(iv). Juniper allegedly admitted to backdating between 1999 and 2004 and restated its financial data for 2002 through 2005. *Id.* In an action filed in this district, *In re Juniper Networks, Inc. Securities Litigation*, case number 06-04327-JW, Levy is personally accused of authorizing and approving backdated options as a member of the Compensation Committee and of signing Juniper's false and misleading financial statements. *Id.* In his answer, Levy denies that he backdated options or that the financial statements he signed were false and misleading. *Id.* & Ex. 4, 5.

## II. ANALYSIS

Lead plaintiff Wheatley has owned Extreme stock since August 8, 2000. *Id.* ¶ 40. Extreme moves pursuant to Fed. R. Civ. P. 12(f) to strike allegations concerning transactions that predate Wheatley's ownership because she does not have standing to challenge such transactions. In addition, plaintiffs did not make a demand on the Extreme board before filing this suit. *Id.* ¶ 31. Extreme moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and 23.1 on grounds that plaintiffs have not adequately alleged that demand on the board would have been futile.

### A. Wheatley's Standing

Under both Delaware law and the Federal Rules of Civil Procedure, a shareholder bringing a derivative suit must allege that he was a shareholder at the time of the challenged transaction. 8 Del. C. § 327; Fed. R. Civ. P. 23.1(b)(1). Wheatley has alleged that she "is a current holder of Extreme Networks stock [and] has held shares since August 8, 2000." TAC ¶ 40. As such, she does not have standing to challenge transactions that occurred before August 8, 2000. However, she purports to sue for violations that occurred during the relevant period, which runs from 1999 through 2005. *Id.* ¶ 2. In addition, the TAC contains many allegations of conduct that occurred before August 2000. *E.g.*, *id.* ¶¶ 86-105, 126-27, 140-42.

Rule 12(f) allows a court to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Extreme argues that allegations of transactions and conduct prior to August 8, 2000 are irrelevant as a result of Wheatley's lack of standing and should be stricken. However, as Extreme concedes, lack of standing does not affect a demand futility analysis. *In re MIPS Techs., Inc.*, 2008 WL 3823726 (N.D. Cal. Aug. 13, 2008) at *3. Plaintiffs argue that events prior to August 8, 2000 illustrate a pattern of backdating that renders the Demand Board interested. Thus, the allegations are relevant in spite of Wheatley's lack of standing, and the motion to strike is denied. *See In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1005 (N.D. Cal. 2007) (allowing plaintiff to refer to grants predating his ownership "to establish the predisposition of management to engage in backdating").

**B.     Demand Futility**

"A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile." *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999) (citing Fed. R. Civ. P. 23.1). The circumstances which make a demand futile are established by the laws of the state in which the corporation is incorporated. *Id.* at 990. Extreme is incorporated in Delaware and, as such, the court turns to Delaware law to consider whether demand is excused.

Two tests for demand futility are applied under Delaware law. Where the challenged decision was made by the board of directors, demand is excused if the plaintiffs make particularized allegations raising a reasonable doubt that (1) a majority of the board of directors in place at the time of the complaint is disinterested and (2) the challenged acts were the product of the board's valid exercise of business judgment. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). However, if the challenged decision was not a decision of the board of directors, the plaintiffs must create a reasonable doubt that the board of directors in place at the time of the complaint "could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 635 A.2d 927, 934 (Del. 1993). A decision made by a committee of the board is not a decision of the board of directors unless a majority of the board sat on the committee. *See id.*;

*Ryan v. Conrad*, 918 A.2d 341, 353 (Del. Ch. 2007). Here, plaintiffs allege that backdated options were granted by the Compensation Committee, which at all times consisted of less than half the board. Thus, the *Rales* test applies.

At the time the TAC was filed, the board of directors consisted of seven members: Stitt, Carinalli, Levy, Corey, Silverglide, Canepa, and Shoemaker. Thus, to excuse demand, plaintiffs must show that at least four of these directors were not disinterested and independent. Plaintiffs allege that Stitt, Carinalli, Levy, Corey, and Silverglide are interested because: (1) Stitt, Carinalli, Levy, and Silverglide received backdated stock options; (2) Carinalli, Levy, and Corey face liability for their service on the Audit Committee and for approving backdated options while on the Compensation Committee; (3) Levy was involved in backdating at two other companies; and (4) all five directors signed false and misleading SEC filings. Plaintiffs do not allege that Canepa or Shoemaker were not disinterested and independent.

"A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 812). "Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id.* In such circumstances, directors cannot be expected to consider a demand "without being influenced by the adverse personal consequences resulting from the decision." *Id.* "However, the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson*, 473 A.2d at 815.

### 1. Receipt of Backdated Stock Options

Receiving backdated options renders a director interested for the purpose of responding to a demand because the benefit is not shared by the shareholders and "[a] decision to correct the grants would have a detrimental impact on the directors by removing a financial benefit they received." *In re CNET Networks, Inc. Shareholder Derivative Litig.*, 483 F. Supp. 2d 947, 958 (N.D. Cal. 2007). At the pleading stage, "[t]he issue is whether plaintiffs have alleged circumstances from which we

may reasonably infer backdating as opposed to innocent bookkeeping error." *Id.* at 956.

### a. Statistical Methods for Assessing Backdating Risk

Plaintiffs allege that they have analyzed the challenged pre-Sarbanes-Oxley grants pursuant to methods used by the *Wall Street Journal*, Merrill Lynch, and CFRA to determine whether grants are at risk of being backdated. Courts have encountered these methods before and at least the Merrill Lynch analysis has met with some approval. *See Ryan v. Conrad*, 918 A.2d at 354 (accepting an analysis conducted by Merrill Lynch as supporting an inference of backdating); *Edmonds v. Getty*, 524 F. Supp. 2d 1267, 1274, 1276 (W. D. Wash. 2007) (finding sufficient to plead demand futility a complaint modeled after the one in *Ryan*, including allegations using the Merrill Lynch analytical framework). However, courts decline to rely on such methods when not rigorously applied. *CNET*, 483 F. Supp. 2d at 957 (rejecting alleged *Wall Street Journal* and CFRA analyses where "plaintiffs only followed [the analysts'] footsteps halfway"); *In re Openwave Sys. Inc. Shareholder Derivative Litig.*, 503 F. Supp. 2d 1341, 1351 (N.D. Cal. 2007). Upon examining the allegations in the complaint, plaintiffs do not appear to have successfully reproduced any of the three methodologies they cite.

The *Wall Street Journal*'s method looks at the 20 trading days after a grant is made and calculates how much the company's stock appreciated in that period. *CNET*, 483 F. Supp. 2d at 956-57. This 20-day gain is ranked against the 20-day gains of all trading days in the year. *Id.* at 957. Companies with consistently highly ranked grant dates are considered to be at risk for having backdated options. *Id.* While plaintiffs allege the 20-day gains for each challenged grant in the TAC, they fail to allege how such returns rank against other possible grant dates. Thus, these allegations provide no indication of "how unusual, versus the rest of the stock's behavior, the activity following the grant date was." *Id.*

The Merrill Lynch method also looks at the 20-day gain for option grants. Extreme's RJN, Ex. 17. Merrill Lynch calculated the average stock return for the 20 days following any option grants to senior executives and used these averages to determine an annualized management return. *Id.* The firm then compared the annualized management return to the actual stock price returns for the corresponding calendar year. *Id.* Merrill Lynch used the difference to measure the

"aggressiveness" of companies' options pricing policies. *Id.* Instead of looking at average 20-day and annualized returns, plaintiffs' "Merrill Lynch analysis" evaluates each individual grant separately. Plaintiffs also fail to include all officer and director grants and apply the analysis only to the challenged grants. *See Openwave Systems*, 503 F. Supp. 2d at 1351 (rejecting plaintiffs' analysis because it only examined the 20-day returns of its "handpicked option grants" rather than the return on "*all* reported stock option grants during the relevant period"). Notably, the Merrill Lynch report never attempts to identify specific grants that are potentially backdated, Extreme's RJN, Ex. 17, as plaintiffs seek to have its method do.

The CFRA method attempts to identify grants made at exercise prices that match or are close to a 40-day low following or preceding a period of material change in the company's stock price. Extreme's RJN, Ex. 18. Specifically, it flags options where the price on the grant date was within 105% of the 10- or 40-day period stock price low and the stock price range was greater than 10% of the lowest stock price. *Id.*; TAC ¶ 81. CFRA considered companies to be at risk where there were more than three flagged grants among those made between 1997 and 2002. Extreme's RJN, Ex. 18. While accurately reciting CFRA's criteria, plaintiffs appear to have misunderstood their application. Plaintiffs consistently allege that the grant price is *lower* than what they assert to be the 40-day low. *E.g.*, TAC ¶ 97 (alleging that the grant price is 72.9% of the 10- and 40-day period low). These allegations are included even for grants that are not alleged to be anywhere near the lowest stock price of the month or quarter. Plaintiffs also treat CFRA's two criteria as disjunctive, alleging that, while a stock price was *not* within 105% of the lowest price, it nonetheless carried "indicia of backdating" because the stock price had fluctuated a lot. TAC ¶ 105. By this logic, a grant would be suspicious if made before a 20% *drop* in stock price.

The court notes that neither the Merrill Lynch report nor the CFRA report are particularly transparent in explaining their methodology. While plaintiffs are not required to discover the exact procedures used or reverse-engineer the results, they must explain why the analyses in the complaint are informative and suggest backdating. *Cf. CNET*, 483 F. Supp. 2d at 957 (noting plaintiffs' failure to plead "where their method came from, whether it was used by anyone else, or whether it was peer-reviewed or bore other indicia of academic approval"). Plaintiffs have not provided sufficient

ORDER DENYING NOMINAL DEFENDANT'S MOTION TO STRIKE AND MOTION TO DISMISS—07-02268 RMW LJP
11

explanations here. Thus, the court must determine whether the remainder of plaintiffs' allegations raise an inference of backdating. *See id.* at 958 ("Sound analytical methods are one way that plaintiffs could have eliminated the possibility that the returns from the grants were the product of dumb luck. Without them, that inference is more difficult to support.").

### b. Alleged Pattern of Backdating

Of the twelve grants made before Sarbanes-Oxley, plaintiffs allege that three occurred at the lowest price for the month, one at the second lowest, and one at the third lowest. Of those five, three occurred not only at monthly lows but at quarterly and yearly lows. Since a month contains approximately 20 trading days, the probability of selecting the lowest price is approximately one in twenty if one is selecting dates randomly.[3] Out of twelve grants, one would generally expect at most one grant to bear the lowest price of the month and one or two grants to bear the third lowest price or lower. The improbability of Extreme's results is heightened by the even smaller chances of hitting a quarterly or yearly low in price. Thus, although the sample size is small, the results do to some degree support an inference of backdating. *Cf. Zoran*, 511 F. Supp. 2d at 1004 (finding "hugely suspicious" a pattern wherein seven out of thirty-two grants were at the lowest price of the month).

The court in *Zoran* also relied on the fact that many of the challenged grants had been made sporadically in the discretion of the directors, rather than pursuant to a plan that specified fixed grant dates. *Id.* at 1004-05. Plaintiffs do not provide extensive details about the stock option plans at Extreme, but there is no evidence that the challenged grants were made pursuant to any predetermined schedule. In addition, some grants to officers and directors examined by the Special Committee lacked contemporaneous documentation to support the grant date, suggesting that such dates were not selected in advance. A plan that allows flexibility in selecting grant dates "len[ds] itself to possible backdating." *Id.* at 1005.

Plaintiffs also allege that the timing of many grants preceded a "run-up" in share price. While the court does not always agree with plaintiffs' characterization, the stock price movements of

---

[3] Extreme argues that companies do not select grant dates randomly and in fact try to grant options when they believe prices are low. But such a strategy would not enable companies to exactly select *the* lowest (or second or third lowest) price in a month. At best, it weakens the implications of plaintiffs' generalized allegation that most grants were made at prices below the average price for the year, TAC ¶ 83.

the five low grants, combined with the improbability of obtaining the results at random, are sufficient to raise an inference that these grants were backdated. *See id.* (finding sufficient plaintiff's allegation that stock prices increased sharply after all eleven grant dates, "[c]oupled with the statistical pattern of favorable grant dates and the fact that the grant date could be chosen at the will of the compensation committee"). Plaintiffs have not sufficiently alleged that any of the other challenged grants were backdated.

Members of the Demand Board received options on two of the five implicated grant dates. Carinalli, Silverglide, and Stitt received options on April 9, 2001, and Carinalli received options on December 28, 2001. Thus, plaintiffs have pleaded sufficient facts to create a reasonable doubt that directors Carinalli, Silverglide, and Stitt were disinterested.

### c. Material Benefit

Extreme argues that plaintiffs are required to plead that the benefit of these options was material to the directors and that plaintiffs have failed to do so. Extreme relies on *Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2001) and *In re General Motors Class H Shareholders Litigation*, 734 A.2d 611 (Del. Ch. 1999) for the proposition that plaintiffs must plead materiality. Neither of these cases dealt with demand futility. In both cases, plaintiffs were challenging a decision made by the board of directors and seeking to overcome the business judgment presumption by alleging that the directors were interested. *Orman* relies on the definition of interestedness in *Rales*, which considers a director interested when he will suffer a *materially* detrimental impact not shared by the corporation and the shareholders. *Orman*, 794 A.2d at 23 (quoting *Rales*, 634 A.2d at 936). However, *Orman* imposed the materiality requirement only where the challenged transaction did not involve self-dealing, i.e. a personal financial benefit that does not devolve upon the shareholders generally. *Id.* at 23 (quoting *Aronson*, 473 A.2d at 812). Here, the directors' receipt of options was not a benefit shared with shareholders.

Many courts have found that pleading receipt of backdated options is sufficient for assessing demand futility without further inquiry into whether such options were material. *E.g.*, *Zoran*, 511 F. Supp. 2d at 1003 ("[I]f plaintiffs can plead with particularity that the directors received backdated grants, those directors will be considered interested."). The court in *CNET* specifically rejected an

argument similar to the one made here about failure to plead materiality, finding that "[b]y receiving backdated options, [the director] still has a chance of being subject to personal liability despite plaintiffs' sloppy pleading." 483 F. Supp. 2d at 962. Thus, the court declines to hold plaintiffs to a stricter pleading standard.

Extreme points to the Special Committee's finding that none of the affected options granted to directors were ever exercised and all except one have been surrendered or cancelled. It would seem that if a director received backdated options but never realized any benefit and could no longer benefit from them, such options would not be a basis for rendering him interested. *See CNET*, 483 F. Supp. 2d at 958 (explaining that receiving backdated options renders directors interested because they would be unwilling to correct the grant and thereby "remov[e] a financial benefit they received"); *Zoran*, 511 F. Supp. 2d at 1003 (same). However, the statement in the Form 10-K cited by Extreme is insufficient to support such a conclusion. First, the Form 10-K does not explicitly identify the "affected grants" that were never exercised, leaving the possibility that the implicated grants to Carinalli, Silverglide, and Stitt were exercised or remain outstanding. Second, surrender of a stock option does not necessarily equate with deriving no benefit.[4] Even though plaintiff has not alleged whether the backdated options were exercised or whether they remain outstanding, the court finds the fact that these directors received them is sufficient to create a reasonable doubt as to their disinterestedness.

### 2. Levy's Disinterestedness

Plaintiffs focus the bulk of their demand futility allegations on Levy, as this court previously found plaintiffs' failure to plead Levy's interestedness dispositive of the demand futility issue. August 11, 2008 Order at 15. Plaintiffs allege that Levy is interested because (1) he received backdated options, (2) he served on the Compensation Committee, (3) he served on the Audit Committee and executed false SEC filings, and (4) he is implicated in backdating at two other companies. As discussed above, plaintiffs have not adequately alleged that the one challenged grant

---

[4] Plaintiffs suggest that stock options grants may have been accompanied by the grant of tandem stock appreciation rights, which are exercisable only when the corresponding stock option is surrendered. TAC at 74 n.14. However, plaintiff cites only the 2005 Plan, which does not cover any of the implicated grants.

Case 5:07-cv-02268-RMW   Document 111   Filed 11/17/09   Page 15 of 17

to Levy, on October 22, 2001, was backdated. *See also* August 11, 2008 at 14-15.[5] Levy joined the board in October 2001 and the Compensation and Audit Committees in 2004. TAC ¶ 34, 51. The only allegations that backdating occurred after Levy joined Extreme are the December 28, 2001 grant and Extreme's nonspecific admissions that some examined options appeared backdated and that process deficiencies occurred through 2004.

      Plaintiffs argue that Levy's role in or knowledge of backdating at Extreme may be inferred from the fact that he has been accused of backdating at two other companies. Caution is needed before accepting such an argument. A director does not become interested simply because a sufficient number of lawsuits has been filed against him, particularly when none of those lawsuits have resulted in any factual findings of wrongdoing. Nor by referring to accusations in other lawsuits can a plaintiff avoid the requirement that he plead with particularity the grounds for demand futility. With respect to Levy's conduct at Juniper, plaintiffs have provided no more details than that Juniper discovered backdating and Levy was a member of the Compensation Committee. The court has already found, in the context of Levy's involvement at Extreme, that a bare allegation of Compensation Committee service is insufficient. August 11, 2008 Order at 15-16.[6] The mere fact that Levy was a director at multiple companies, during a time when many companies were engaged in backdating, does not implicate him in any particular alleged scheme.

      Plaintiffs have provided more specific details regarding Levy's conduct at KLA-Tencor. The revelations in KLA-Tencor's Form 10-K strongly support an inference that Levy was knowingly involved in backdating stock options at that company and that he received such backdated options. In turn, this supports an inference that Levy was knowingly involved in alleged backdating at

---

[5] Plaintiffs argue that the court improperly inferred that this grant coincided with Levy's joining the Board of Directors, noting Extreme's admissions that some option grants predated the employees' start date and that its SEC filings contained false financial information. Plaintiffs argue they are entitled to an inference "that defendants intentionally manipulated Levy's start date in SEC filings in furtherance of their backdating scheme." Plaintiffs ignore the fact that they are required to plead with particularity why a director is interested. There are no allegations in the TAC that would link Extreme's admissions to this particular grant or suggest that Extreme ever falsified director start dates; in fact, plaintiffs acknowledge that Levy joined the board in October 2001, TAC ¶ 51. Without more, such attacks on this grant are simply stray speculation.

[6] This court does not express an opinion regarding how any allegations should be evaluated by the court in the Juniper litigation.

ORDER DENYING NOMINAL DEFENDANT'S MOTION TO STRIKE AND MOTION TO DISMISS—07-02268 RMW LJP
15

Extreme. In light of the other allegations in the complaint, the court finds that these allegations are sufficient to create a reasonable doubt that Levy is disinterested in the present litigation. Thus, plaintiffs have successfully pleaded that demand is excused.

### III. ORDER

For the foregoing reasons, the court DENIES Extreme's motion to strike and motion to dismiss.

DATED:     11/17/09                          /s/ Ronald M. Whyte

RONALD M. WHYTE
United States District Judge

**United States District Court**
For the Northern District of California

1  **Notice of this document has been electronically sent to:**

2  **Counsel for Plaintiffs:**

3  Robert Bramson            rbramson@bramsonplutzik.com
   Emanuel Shachmurove       mshachmurove@sbtklaw.com
4  Aelish Marie Baig         AelishB@csgrr.com
   Lawrence Timothy Fisher   ltfisher@bramsonplutzik.com
5  Alan R Plutzik            aplutzik@bramsonplutzik.com
   Frank James Johnson       frankj@johnsonbottini.com
6  Shawn A. Williams         shawnw@csgrr.com
   Eric L. Zagar             ezagar@sbtklaw.com
7  Lucas F. Olts             like.olts@bullivant.com

8  **Counsel for Defendants:**

9  John Henry Hemann         jhemann@morganlewis.com
   Jonathan DeGooyer         jdegooyer@morganlewis.com
10 Joseph Edward Floren      jfloren@morganlewis.com
   Laura Alexis Lee          llee@morganlewis.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**      11/17/09                              CCL
                                              **Chambers of Judge Whyte**